

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-003-CR

JEREMY DON SCOTT-ROTH                    APPELLANT

V.

THE STATE OF TEXAS                              STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

This is an appeal from the trial court's denial of a motion for new trial following a revocation hearing. Appellant Jeremy Don Scott-Roth argues in two points that the trial court abused its discretion by denying his motion for new trial because (1) his trial counsel rendered ineffective assistance by failing to impeach a crucial defense witness who allegedly changed his testimony and by

---

[1] ... See Tex. R. App. P. 47.4.

failing to call Scott-Roth to take the stand to refute testimony from the State's witnesses and (2) a crucial defense witness had allegedly been "tampered with." We will affirm.

## II. BACKGROUND

In 2002, Scott-Roth pleaded guilty to aggravated assault - family violence and aggravated assault - against a public servant. Pursuant to a plea bargain agreement, the trial court sentenced Scott-Roth to ten years' imprisonment, suspended the sentence, and placed him on community supervision for ten years.

In November 2007, a birthday party was held at the trailer where Scott-Roth, Katheryn (Katy) Starr, Starr's daughter Liberty, Starr's sister Danielle, Danielle's daughter, and Danielle's boyfriend Dusty lived. The record reveals that Starr and Scott-Roth had separated several days before the party and that Starr had left the bulk of her belongings at the trailer where Scott-Roth continued to reside. Starr began collecting her belongings, while Scott-Roth dismantled Liberty's crib so that Starr could take it with her. While Starr, Scott-Roth, and Starr's mother Debra LaDeen Summer were in the trailer, "everything just exploded." Scott-Roth hit Starr in the temple with his fist, causing her head to hit the wall. Summer tried to break up the fight, but Scott-Roth grabbed her arm and bore down on it until it broke. Others, including

2

Dusty and a neighbor named Hershall Pollack, intervened to break up the fight, and the police were called.

The State thereafter filed its first amended motion to revoke community supervision, alleging that Scott-Roth had violated the terms and conditions of his community supervision by unlawfully, intentionally, or knowingly causing serious bodily injury to Debra LaDeen Summer by grabbing and/or bending her arm in a manner that caused a fracture of her arm; by unlawfully, intentionally, or knowingly causing bodily injury to Katheryn Nichole Starr by striking her in the head with his fist; and by drinking beer. After hearing evidence on the motion to revoke, the trial court found the allegation as to Summer not true, the allegation as to Starr true, and the allegation as to drinking true. The trial court entered a judgment revoking Scott-Roth's community supervision and ordering him confined for five years on each charge of aggravated assault.

Scott-Roth thereafter filed a motion for new trial and motion in arrest of judgment arguing that Pollack, a defense witness, was "tampered with" by a State's witness and that Scott-Roth's trial counsel was ineffective (a) for failing to offer witnesses who would testify that Scott-Roth had abstained from the use of alcohol and (b) for failing to impeach Pollack with a statement he gave to a defense investigator.

At the hearing on the motion for new trial, Netah Ladyman and Lena Kinnard testified that they met up with Pollack to have breakfast on the morning of the revocation hearing. While they were at the restaurant, Pollack went outside to smoke and spoke with Starr's sister, Danielle, who was in the restaurant parking lot. Afterward, Pollack told Ladyman and Kinnard that "[t]hey're going to try to say that I perjured myself," that he had a case pending against him in Oklahoma, and that he needed to say that Scott-Roth was drinking and that he (Pollack) did not see anything. Ladyman said that Pollack talked to Starr's family at the courthouse before he testified and that after he testified, he came out and said that he had to testify that he was outside the trailer and that he did not go in until he heard a thud against the wall. Ladyman said that this was different than what Pollack had told her before; he had said that he was in the living room of the trailer when the fight started. Scott-Roth also took the stand at the hearing on the motion for new trial and explained his decision not to testify on his own behalf at the revocation hearing; Scott-Roth's trial counsel did not testify. After hearing the above testimony, the trial court denied the motion for new trial, and this appeal followed.

### III. RECORD IS INSUFFICIENT TO ESTABLISH INEFFECTIVENESS

In his first point, Scott-Roth argues that the trial court abused its discretion by denying his motion for new trial because his trial counsel rendered

4

ineffective assistance by failing to impeach a crucial defense witness who allegedly changed his testimony and by failing to call Scott-Roth to take the stand.

### A.    Standard of Review

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813.  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065.  Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within

5

a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63. A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

B.    Failure to Impeach Defense Witness

Scott-Roth first argues that his trial counsel rendered ineffective assistance by failing to impeach defense witness Pollack with the statement he had previously given to a defense investigator.

Here, the record reveals that during the revocation hearing, Pollack testified that he was standing outside the trailer when he heard the sound of someone inside hitting the side of the trailer. When he went inside, he

6

observed Summer swinging at Scott-Roth and saw that Scott-Roth was trying to catch her hands so that she would not hit him.  Pollack also testified that he did not see Scott-Roth drink that day; Pollack had offered Scott-Roth a drink, but he did not take it.

An investigator for the defense interviewed Pollack and included the following in his report:

> On September 24, 2008 at 11:20 PM, I called Hersh[a]ll Poll[a]ck . . . who agreed to talk with me.  Hersh[a]ll Poll[a]ck stated he was at Danielle Wester and Jeremy Roth's trailer giving a birthday party for Summer, Danielle's daughter.  After the party Katy was telling Jeremy what she was going to be taking.[2]  At that time, Katy's mother jumped in telling Jeremy what they were going to be taking.  Jeremy told Katy's mother that he and Katy will decide on what will be taken.  That's when Katy's mother started swinging at Jeremy and that's when Jeremy tried to defend himself by grabbing Katy's mother's arms to keep Katy's mother from hitting him (Jeremy).  Dusty Owens got them separated and escorted out of the house.  Hersh[a]ll had grabbed Katy's mother from behind in a bear hug and carried her outside. . . .

Scott-Roth contends that his trial counsel should have impeached Pollack with the above report, arguing that it "is obvious from this [report] that Mr. Poll[a]ck was inside the house when the events occurred and that there was no assaultive conduct by Appellant."  The above report, however, does not state that Pollack was inside the trailer, only that he was "at" the trailer for a

---

[2] The "taking" mentioned here is in reference to Starr and Scott-Roth's attempting to divide their belongings.

7

birthday party. The report also does not describe the conduct that transpired to cause the sound of someone inside hitting the side of the trailer, which Pollack testified had occurred before he went inside. Rather than contradict his testimony, the statement that Pollack gave to the defense investigator tracks the testimony he gave at the revocation hearing regarding what he saw when he entered the trailer and is consistent with the accounts that the victims, Summer and Starr, gave regarding Pollack not being in the trailer at the time the "thud" occurred.[3] Moreover, even if Pollack's statement in the above report could somehow be construed to conflict with the testimony he gave at the revocation hearing, we cannot conceive of a sound trial strategy that would have required Scott-Roth's trial counsel to attempt to impeach Pollack after he gave testimony—that Summer, not Pollack, was the aggressor and that Pollack did not have anything to drink—favorable to Scott-Roth's defense. Based on the record before us, in light of the strong presumption of reasonable professional assistance by defense counsel, and in the absence of any opportunity for defense counsel to explain his motives for not impeaching Pollack, we cannot say that Scott-Roth has met his burden of showing by a

---

[3] ... The "thud," according to Starr's testimony, occurred when Scott-Roth hit her in the temple with his fist, and her head popped back and hit the wall of the trailer.

8

preponderance of the evidence that his trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Thompson*, 9 S.W.3d at 813; *Edwards v. State*, 280 S.W.3d 441, 445 (Tex. App.—Fort Worth 2009, pet. ref'd); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (stating that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective").

C.      Failure to Call Scott-Roth to Testify

Scott-Roth also argues that his trial counsel rendered ineffective assistance by failing to call him to testify at the revocation hearing to refute Starr's testimony.

At the hearing on the motion for new trial, Scott-Roth testified on direct as follows:

> Q.      Did Mr. Trotter call you as a witness to give your version of the events as to what happened at the trailer house?
>
> A.      No, he did not.
>
> Q.      And if he had, would you have testified that you did not assault Katheryn Starr?
>
> A.      That's correct.
>
> Q.      What was Mr. Trotter's -- Why did Mr. Trotter recommend to you, if you know, as to why you shouldn't testify?

9

A. At that point it seemed like the -- the case was going pretty well in my favor and thought that me being on the stand would only -- could only produce damning testimony to my case.

On cross-examination, Scott-Roth testified as follows:

Q. Sir, I want you to think about the day that we had the hearing on your revocation. You walked in that door in the courtroom and you were planning to testify that day, weren't you?

A. I didn't know at that time if I was going to have to or not.

Q. Okay. But you were prepared to testify?

A. Yes, I was.

Q. And over the course of the hearing, you and your lawyer, Mr. Trotter, on at least one occasion, maybe more, actually took a recess and went back in that jury room and discussed the case, correct?

A. We did take a recess to do that, yes, we did.[4]

Q. It's not your testimony today that you weren't allowed to --

A. No, no.

Q. -- to testify?

A. No.

_____

[4] After the State rested during the revocation hearing, Scott-Roth's trial counsel asked to take a break to determine "where we go from here now." After three defense witnesses testified, Scott-Roth's trial counsel asked for a couple of minutes to discuss with his client what their next step would be (i.e., to rest or to call another witness).

Q. You made a decision not to take the stand, yourself, correct? And you advised Mr. Trotter at that time based on his advice you didn't want to testify?

A. Based on Mr. Trotter's advice, yes.

Q. But he never told you, you couldn't testify?

A. No.

Q. He never told you he wasn't going to allow you to testify?

A. No.

Q. In fact, he told you, [i]t's your option but I advise against it, right?

A. Correct.

Q. So you still could have taken the stand and told the Court everything you just said?

A. I could have, yes.

And on recross-examination, Scott-Roth reaffirmed:

Q. And you could have taken the stand if you wanted to and explained all that [his side of the story] to the Judge at the hearing, and you chose not to, right?

A. If I thought I needed to, yes.

Here, the record from the hearing on the motion for new trial reveals that Scott-Roth and his trial counsel came to an agreement that Scott-Roth should not take the stand at the revocation hearing based upon sound trial strategy—that the trial was going well and that his testimony would be

11

detrimental. Scott-Roth thus has not overcome the strong presumption that his trial counsel performed within reasonable standards. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Thompson*, 9 S.W.3d at 813; *Salas v. State*, No. 14-02-00318-CR, 2003 WL 22769731, at *4 (Tex. App.—Houston [14th Dist.] Nov. 25, 2003, pet. ref'd) (not designated for publication) (holding that trial court did not abuse its discretion by denying appellant's motion for new trial based on alleged violation of his right to testify).

D.     Ineffective Assistance Not Shown

Having disposed of both of Scott-Roth's ineffective assistance arguments, we overrule Scott-Roth's first point.

IV. REVOCATION CAN BE UPHELD ON INDEPENDENT BASIS

In his second point, Scott-Roth argues that the trial court abused its discretion by denying his motion for new trial "based on the State's witness tampering with a crucial defense witness at the revocation hearing." We need not reach the merits of Scott-Roth's contention because, as pointed out by the State, Scott-Roth cannot show an abuse of discretion on the part of the trial court by denying his motion for new trial on his alleged witness tampering claim in light of an independent basis on which to uphold the revocation. Here, Scott-Roth does not challenge the trial court's finding that he drank alcohol in violation of the conditions of his community supervision. Because this

12

unchallenged independent basis exists on which the trial court could have upheld Scott-Roth's revocation, we hold that the trial court did not abuse its discretion by denying Scott-Roth's motion for new trial. *See Smith v. State*, 286 S.W.3d 333, 342–43 (Tex. Crim. App. 2009) (holding that "[e]ven assuming that the appellant could successfully challenge the failure to report violation, the trial court was justified in revoking his deferred-adjudication community supervision" because grounds three and four of the State's motion to revoke, if found true, remained sufficient to support the trial court's decision to proceed to an adjudication of the appellant's guilt). We therefore overrule Scott-Roth's second point.

## V. CONCLUSION

Having overruled Scott-Roth's two points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: September 17, 2009

13